# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF JON THOMAS CARMICHAEL,  BY AND THROUGH JON TIMOTHY AND TAMI CARMICHAEL, INDIVIDUALLY AND UPON BEHALF OF HIS HEIRS **Plaintiffs,**<br><br>**v.**<br><br>RONNIE GALBRAITH, PRESIDENT OF THE SCHOOL BOARD OF THE JOSHUA INDEPENDENT SCHOOL DISTRICT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; RAY DANE, SUPERINTENDENT OF THE JOSHUA INDEPENDENT SCHOOL DISTRICT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; AND KENNETH RANDALL WATTS, DAYTON BARRONE, WALTER STRICKLAND AND ELIZABETH ROSATELLI, ALL INDIVIDUALLY. **Defendants,** | § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.: _____ |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** Jon Timothy and Tami Diane Carmichael, Individually and in their representative capacities in "The Estate Of Jon Thomas Carmichael, Deceased, collectively termed Plaintiffs herein, by and through their attorneys, Martin J. Cirkiel from the law firm of Cirkiel & Associates, P.C., and Mike Zimmerman from the Zimmerman Law Firm, brings this their *First Original Complaint* alleging that Ronnie Galbraith, Superintendent Of The Joshua Independent School District (hereinafter referred to as "Joshua ISD" or the "Defendant School District"), Individually and in his Official Capacity (hereinafter referred to as the "Superintendent" or

Defendant Galbraith); Ray Dane, Individually and in his Official Capacity as President of the

Joshua Independent School Board (hereinafter referred to as Defendant Dane or the "The School

Board Defendant"); Kenneth Randall Watts, Teacher at the Joshua ISD, Individually; Walter

Strickland, Teacher at the Joshua ISD, Individually; Dayton Barone, Teacher at the Joshua ISD,

Individually; and Elizabeth Rosatelli, Counselor at the Joshua ISD, Individually; all hereinafter

collectively referred to as the  "School District Defendants," jointly and severally violated the

various rights of Jon Thomas Carmichael, as more specifically pled herein.  Plaintiffs reserve the

right to replead if new claims and issues arise upon further development of the facts, and as

permitted by law.  In support thereof, Plaintiffs would respectfully show the following:

## I.  INTRODUCTION AND BRIEF REVIEW OF THE CASE

1. While Jon Thomas Carmichael was a student at the Joshua Independent School District he

   was bullied, harassed and called names, every day.  He was bullied in physical education

   class and in the locker room, which was observed by staff, who did nothing.  He was thrown

   into a dumpster, which was observed by Defendant Strickland, who did nothing.  On a

   number of occasions, Jon was accosted by a group of boys in the locker room which was

   observed by Defendant Watts.  He was placed upside down in a toilet bowl, and had his head

   flushed several times, at each occasion.  These acts were observed by other students who

   failed to report the incident.  Just prior to his death he was stripped nude, tied up and again

   placed into a trashcan.  The event was videotaped, put on YouTube but was later taken down,

   at the direction of an unknown staff member, who also failed to report the incident.

2. Not surprisingly, Jon became depressed and eventually suicidal because of these attacks.

   When he spoke with his Counselor, Defendant Rosatelli, she too did nothing about the

bullying or his depression.  Just a day or so before his suicide, Jon attempted to reach out to Defendant Barone, who also did nothing.  Last, and on the day of the suicide he reached out to another student and told her that he was going to commit suicide.   It should come as no surprise that she was like her elders in the school community, as she too failed to report Jon's outcry.  In fact, she said, "do it, that no one cared," which of course, is absolutely the same response she learned from all the adults around her.

3.      Even though the district ostensibly had a policy in place to deal with known incidents of bullying and harassment, school district personnel clearly had an actual practice and custom of looking the other way.   The failures rise to the level of conscious and deliberate indifference and also shocks the conscience of any reasonable person.

4.      Further, school district personnel attempted to cover up their acts and omissions. Specifically, school staff directed a student who had a video of the assault of Jon to destroy the video.   In addition, the School District Defendants had Jon's personal journal which spoke to issues of bullying and suicidality, and that has been knowingly destroyed, withheld or purposefully hidden by staff, as well.

5.      It is because of various acts and omissions of the School District Defendants, individually, severally and in concert with each other, that Plaintiffs seek damages and compensation, Individually and on behalf of the heirs of the Estate of Jon Thomas Carmichael. Plaintiffs bring this action pursuant to 42 U.S.C. §1983 of the Civil Rights Acts for violations of the 14th Amendment to the United States Constitution; Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.* and for claims related to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794a ("Rehabilitation Act").

They also bring forth state claims pursuant to Tex. Civ. Prac. & Rem. Code, 71.001 et. seq, for a "Wrongful Death" proceeding and at Tex. Civ. Prac. & Rem. Code, 71.021 001 et. seq for a "Survival Claim."

## II. <u>JURISDICTION</u>

6.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

7.      Furthermore, this Court and supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. § 1367.

8.      Finally, this Court has jurisdiction pursuant to 42 U.S.C §1988 and §2000d et seq., to award attorneys fees and other costs of representation to the Plaintiffs.

## III. <u>VENUE</u>

9.      Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Northern District of Texas and in the Dallas Division.

## IV. <u>PARTIES</u>

10.     Jon Thomas Carmichael, when alive, was a citizen of the State of Texas, and was, at all pertinent times, a pupil in the Joshua Independent School District.

11.     His parents, and natural heirs in this proceeding are Jon Timothy Carmichael, his father and Tami Diane Carmichael, his mother. They live at 813 County Road 701, Cleburne, Texas 76031.  They too are citizens of the State of Texas and residents of Johnson County and bring forward this complaint individually, and as heirs and representatives of the Estate of Jon Thomas Carmichael.  He is also survived by his sister, Crystal Carmichael Bolt and

bother, Jimmy Brooks.

12.  Defendant Ronnie Galbraith, is sued in his Individual and Official Capacities as President of the School Board at the Joshua Independent School District, which is a school board organized under the laws of the State of Texas and at all times was responsible for the implementation of relevant federal and state law, the care, management and control of all public school business within its jurisdiction as to students like Jon Carmichael, the training of teachers at the School as to safety, bullying, harassment based upon gender and supervision of students within the district, and for the course of study. Plaintiffs reasonably believe he may be served by and through his counsel, the Honorable Rhonda Crass, Attorney wi the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

13.  Defendant Ray Dane, is sued in his Individual and Official Capacity as the Superintendent of the Joshua ISD, a school district organized under the laws of the State of Texas and at all times required to follow the policies and procedures as set forth by the School Board. Dune is required to assure that District personnel are responsible for the care, management and control of all public school business within its jurisdiction, the training of teachers at the School as to safety, bullying and discrimination based upon gender, and to assure the reasonable safety and supervision of students within the district, and for the course of study. He too may be served by and through his counsel, the Honorable Rhonda Crass, Attorney with the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

14.  Defendant Walter Strickland, is a teacher at Joshua ISD and was familiar with the acts and

omissions that led to the untimely decease of Jon Thomas Carmichael. His job duties, among other things, was to help keep the school environment safe and that school board policies regarding bullying, and harassment based upon gender, were followed. He too may be served by and through his Counsel, the Honorable Rhonda Crass, Attorney with the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

15.     Defendant Kenneth Randall Watts, is a former teacher at Joshua ISD and was familiar with the acts and omissions that led to the untimely decease of Jon Thomas Carmichael and was on notice as to his being bullied.  His job duties, among other things, was to help keep the school environment safe and that school board policies regarding bullying, and harassment based upon gender, were followed and that students who were identified as suicidal be treated as such.  He too may be served by nd through his Counsel, the Honorable Rhonda Crass, Attorney with the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

16.     Defendant Dayton Barone, is a teacher at Joshua ISD and was familiar with the acts and omissions that led to the untimely decease of Jon Thomas Carmichael and was on notice as to his suicidality. His job duties, among other things, was to help keep the school environment safe and that school board policies regarding bullying, and harassment based upon gender, were followed and that students who were identified as suicidal be treated as such.  He too may be served by nd through his Counsel, the Honorable Rhonda Crass, Attorney with the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

17.     Defendant Elizabeth Rosatelli, is a Counselor at Joshua ISD and was familiar with the acts

and omissions that led to the untimely decease of Jon Thomas Carmichael and was on notice as to his suicidality. Her job duties, among other things, was to provide counseling services to him and make recommendations and interventions accordingly. She too may be served by and through his Counsel, the Honorable Rhonda Crass, Attorney with the Law Firm of Henslee, Schwartz, L.L.P at 303 West 7th Street, Fort Worth, Texas 76012.

## V. <u>HISTORICAL, CULTURAL AND FACTUAL BACKGROUND</u>

18.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

A.   THE HISTORY OF BULLYING AND HARASSMENT

19.   The infamous Columbine High School massacre occurred on Tuesday, April 20, 1999.  Eric Harris and Dylan Klebold, both known to have serious emotional disturbances and also known by school officials to be victims of bullying and harassment themselves, embarked on a horrid massacre, killing twelve (12) students and one teacher. They also injured twenty-one (21) other students directly, and three people were injured while attempting to escape. Not surprisingly, the pair then committed suicide.

20.   Importantly, the issue of bullying and harassment in schools was already a major concern even before *Columbine*.  In fact, just a few months earlier, in January of 1999, the U.S. Department of Education ("DOE") produced a document, *Protecting Students From Harassment And Hate Crime* , which essentially provided for schools a "Checklist of items, that if they followed, would help to develop a culture that make the schools safer for all students and help to <u>prevent</u> bullying and harassment.  These items included but were not limited to the mandate that Board members, administrators and the superintendent should:

a.      recognize the urgency of the problem and identify people/agencies that can help develop effective prevention and response strategies,

b.      compile a library of useful materials;

c.      work on creating an effective anti-harassment program in consultation with parents, students, and community groups;

d.      appoint a Compliance Coordinator to train School personnel;

e.      assess the school climate to determine the prevalence of harassment that exists and the potential for hate-motivated violence;

f.      adopt a written anti-harassment policy and assure the policy is clearly communicated to all members of the school community; and school personnel and students are held accountable for their actions;

g.      develop a formal grievance procedure and takes steps to make sure it is working properly;

h.      have instructional personnel use or supplement a district's curriculum and pedagogical strategies to foster respect and appreciation for diversity;

i.      institute, improve, or expand age appropriate student activities to prevent or reduce prejudice and conflict;

j.      institute specific measures to respond immediately and effectively when harassment occurs to stop the harassment and prevent recurrence;

k.      flexibly apply response mechanisms to both the victim and the perpetrator, taking into account the parties' ages and the context of the behavior;

l.      continually monitor the school climate and promptly address problems that could

    lead to harassment or violence or that indicate that harassment could be occurring;

m. appoint appropriate school officials to become familiar with pertinent civil and criminal laws at the state, local, and federal levels, so that they are able to recognize possible civil rights violations, hate crimes and other criminal acts;

n. develop guidelines and procedures for collaboration with law enforcement officials, make appropriate referrals to outside agencies and designate liaison personnel;

o. assure Crisis Intervention Plans are in place to minimize the possibility of violence or disruption of the educational process;

p. have District-level personnel and individual school sites form continuing partnerships with parents and the community to prevent hate crimes and harassing behaviors;

q. provide Staff training and professional development programs to support the district's anti-harassment efforts;

r. assure that all harassment incidents are carefully documented and incidents are reported to outside authorities as required; and

s. regularly assesses the effectiveness of its anti-harassment efforts.

21. In January of 2001 the U.S. the *Office Of Civil Rights* within the United States *Department Of Education* issued the "Revised Sexual Harassment Guidance." It contemplated many of the same investigatory issues and responses noted above. Importantly it noted that discrimination based upon gender-based stereotypes, as well as gender based harassment is actionable.

22. Over the course of time the *Office Of Civil Rights* within the United States *Department Of Education* issued numerous opinions on the issues of bullying and various types of

harassment.  Its intent was to give school boards further direction as to how to deal with this ongoing threat to not only the safety of children but to assure they were received an education that was not hostile.

23.     These standards as set forth by the OCR and the DOJ were again underscored in May of 2009, when the U.S. Department Of Justice, promulgated *Bullying In Schools*.  In that document the DOJ noted that a failure to do any of the following various items could create a hostile educational environment for a student:

a.      provide school assemblies and instruction on bullying;

b.      address bullying in classroom intervention settings;

c.      conduct a school bullying assessment;

d.      form a bullying prevention coordination team at school;

e.      include language specifically identifying bullying in the school rules;

f.      develop strategies to prevent bullying in hot spots;

g.      post signs in classrooms prohibiting bullying & listing its consequences; and

h.      encourage students to help classmates who are being bullied & to report bullying.

24.     In regard to handling an incident once reported, the DOJ, echoing OCR, also noted a school district should:

a.      train staff on how to investigate a claim of bullying and harassment;

b.      fully investigate allegations of bullying and harassment;

c.      respond to each allegation promptly;

d.      interview the student and the perpetrator;

e.      keep a written record of the investigation;

f.      taken prompt action against the perpetrators;

g.      remove the perpetrator from the class;

h.      take action to prevent future incidents;

i.      offer to transfer the student or to a different class;

j.      offer counseling for the student victim;

k.      offer counseling to the perpetrator;

l.      notify parents of their rights to file grievances;

m.     offer the student a 1:1 aide or "shadow" for protection;

n.      offer social skills training to the student;

o.      offer social skills training to the perpetetrator;

p.      offer social skills training to the student's class;

q.      convene a meeting of the parents, and educators to discuss the issues of bullying and harassment;

r.      use a program to monitor and oversee the resolution of incidents;

s.      hire a temporary paraprofessional to monitor the perpetrator after the incident;

t.      perform a psychological evaluation of the student victim after the incident; and among other things; and

u.      most importantly use the incident as a "teaching moment" for the perpetrator and even the entire student body.

25.     In light of a number of recent bullying and suicide deaths in the United States, OCR was concerned that its message regarding school-safety and bullying and harassment was not getting out.  To that end and on October 26, 2010, the U.S. Department Of Education, *Office*

*For Civil Rights*, re-urged all the above, and sent a letter memorandum to all public schools regarding the issues of bullying and harassment.  In short, the OCR reinforced all its earlier concerns (as well as the DOJ's) on this issue and reinforced the need for schools to be vigilant in the manner in which it addressed peer-on-peer assaults, bullying and all forms of harassment.

26.     These federal guidelines and standards are applicable to all public schools that receive federal funds, as does the Joshua ISD.

B.      ASSAULT, BULLYING AND HARASSMENT IN TEXAS

27.     These federal guidelines and directives were not a mere federal mandate, but were integrated into, and became part of, Texas law as well.  First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students. Tex Education Code, §37.01 [Student Code Of Conduct]. In addition, the Texas Education Agency ("TEA") and their various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school boards as to how to best prevent assaults, bullying and harassment in general.

28.     Further, and on May 3, 2005, the Texas House of representatives promulgated H.B. 283 which modified and specifically added sections to the Texas Education Code regarding bullying and harassment.  In addition to already promulgated sections on dealing with assaults at school, it added §25.0341 giving students who were bullied the right to seek a transfer to another classroom or campus.

29.     It amended Section 37.001 by adding Subsection(a)(7) and (8) requiring a School Board to adopt a "Student Code Of Conduct" which considered, among other things, bullying and

harassment, and the duty to have <u>methods</u> (emphasis added) to prevent and intervene in bullying problems.

30.    It also amended §37.083(a) by requiring the school district to adopt and implement a "discipline management program to be included in the (school) district improvement plan." The program <u>must</u> (emphasis added) provide for prevention and education about unwanted verbal aggression and bullying.  It took effect no later than September 1, 2005.

31.    In addition, school board's were provided significant information from the Texas Association Of School Boards ("TASB") on how to best respond to assaults, bullying and harassment, when it occurred.  In fact, in September of 2008, TASB disseminated a memorandum entitled *Harassment And Bullying Policies In Public Schools.*  It noted the requirement that school's must have an active policy and practice regarding "student-to-student harassment." It noted, and among other things that a school district could be liable when there is student-to-student harassment and the district's "deliberately indifference cause students to undergo harassment or makes them vulnerable to it, and the harassment takes place in a context subject to the school district's control," *citing* <u>Davis v. Monroe County Board Of Education</u>. 526 U.S. 629 (1999).  In regard to addressing issues of assault, bullying and harassment it referred school districts in Texas to look to the Office of Civil Rights, *Protecting Students From Harassment And Hate Crimes: A Guide For Schools* (as noted above). Between 2004 and 2008 about 548 teens in Texas committed suicide.  In May of 2009, a girl at the nearby Cleburne High School Committed suicide.  In October of 2009, a male student at the nearby Cleburne High School also allegedly committed suicide.

32.    In addition TASB also helped the Joshua ISD develop a number of policies, procedures and

practices related to bullying, harassment and sexual assault but not one teacher, coach, counselor or administrator ever used any one of these policies, procedures or practices to help Jon.

B.     THE SCHOOL DISTRICT'S RESPONSES TO BULLYING AND HARASSMENT

33.    For instance, as early as December 0f 2003, the Joshua ISD promulgated a policy regarding assaults occurring at school.  It contemplated very specific language prohibiting such conduct and the appropriate actions district personnel must take when they observe student-to-student assaults.

34.    Pursuant to HB 283 and related state law, the Joshua ISD also completed a "District Improvement Plan" and one for each campus as well, to deal with "Safe Schools," assaults, harassment and bullying.

35.    The School Board also developed a policy on "Student Welfare," addressing among other things, that it would be considered discrimination, if a person is harassed or bullied based upon gender or disability. It sets very specific standards for investigations.  Investigations were to be completed as soon as possible and within ten (10) days. Importantly parents were to be given notice of any such harassment.

36.    In June of 2008, the School Board, promulgated a specific policy on bullying and harassment.  It too set forth specific requirements for reporting bullying, investigating bullying and training and supervising staff about this problem.

37.    Importantly, this new policy also specifically that students also had an affirmative duty to report such activities when observed.  This specific requirement also was incorporated into the *Student Handbook* and *Student Code Of Conduct*.

38.     Unfortunately, while many school boards across the country and across our own great state heard this clarion call and made anti-bullying campaigns an integral part of that school district's practices and customs, unfortunately, the Joshua Independent School District, their Board President, their Superintendent, teachers and counselors, only gave these concerns "lip service," and turned a "blind eye" to the problem.

39.     In short, there is no evidence in the educational record provided to the family, or the facts known by the family, as confirmed by many of Jon's friends, that any of the various School District Defendants ever put into practice their own policies and procedures in regard to responding to and acting to prevent future occurrences of assault, bullying and harassment in general, or in regard to Jon Thomas Carmichael, any as to him in particular.

40.     It is clear that Joshua Independent School District community had a climate that condoned bullying and harassment and looked the other when it occurred. Such a failure evidences conscious indifference to the rights of Jon Thomas Carmichael, by the Joshua Independent School Board President, the Superintendent and the other school district Individual Defendants.  Clearly they failed to effectively train staff and supervise staff.

41.     In short, rather than promote a school climate that was sensitive to the issue of bullying and harassment, the School District Defendants actually let fester a climate where bullying and harassment was rampant and when it occurred, not only did not know how to respond but looked the other way.

42.     Certainly any one of the failures noted above, taken in isolation, do not necessarily evidence the school violated the rights of Jon.  That being said, the numerous failures of the various School District Defendants, jointly an severely, to develop programs and practices sensitive

to bullying and harassment of students absolutely affected the perception of school district officials and personnel in this case.

43.   It is with all this in background that Plaintiffs now provide their specific "Statement Of Facts" about Jon.

C.   STATEMENT OF FACTS ABOUT JON THOMAS CARMICHAEL

44.   Jon Thomas Carmichael was born on July 30, 1996 and on March 28, 2010 he took his own life.

45.   Jon was taking a medication for Attention Deficit Hyperactivity Disorder which was well known to school staff.  Further, Jon had a serious problem with grades in the fall of 2009, was beginning to miss school and was often late for classes. For all these reasons and more, he began to see a school counselor.  Nevertheless and with all this in mind, he was never referred for an assessment for Section 504 services.  If he had, and his educational and emotional needs would have been addressed in an appropriate and open forum, he would have received necessary related services commensurate his needs.

46.   Jon was bullied at school almost every day he was there. L.B. said he was bullied because he was short.  F.Z, said he was bullied because other kids thought it was funny.

47.   G.S. reports that he witnessed Jon being put upside down into the school's dumpster by some bullies.  So did S.H. and Amy Bryant.  All report they saw that Defendant Strickland and a school bus driver, also observed the incident.  Both failed to report the incident or have it investigated, pursuant to School Board policies.

48.   In addition, Jon was frequently bullied in physical education class, on the football field and in the locker room.  A.P stated that he observed that Defendant Strickland and other P.E.

staff, including and especially Kenneth Randall Watts, saw many of the incidents through their office window but failed to intervene.

49.    G.S. reports that when Jon was on the football field some of the kids would get behind Jon and Chris Montelongo and some others would push him down, on almost a daily basis. When Coach Strickland observed the incidents he would sometime make them run extra laps but otherwise did nothing to prevent future incidents.

50.    Just after Christmas, S.M. saw a few boys take Jon's backpack, throw it on the ground and stomp on it and broke some cologne his mother had given him a present.  This too was observed by a number of students.

51.    In early February Jon saw his counselor Defendant Elizabeth Rosatelli.  He wrote in his personal journal '' I am starting to see a counselor about my problems...... She told me because I'm pushed around too much and stuff my feelings inside.''  A review of the journal denotes he wrote about numerous discussions with his school counselor, and are exceedingly clear that the counselor knew that Jon was a victim of bullying.  She never reported it or had it investigated pursuant to Board policy.

52.    On a number of occasions, D.L. saw that Jon was accosted by a group of boys (Chris Montelongo and A.C.) and was placed upside down in a toilet bowl, and had his head flushed several times, at each occasion.  T._. and J._ both observed it occur and knows that school coaches observed it and knew hat it happened. None of the teachers ever reported it.  This incident happened again just before Spring Break and shortly before Jon's suicide.

53.    A student nicknamed Turbo would pick Jon up, place him upside down and throw him into the trash can, easily a few times a week.  It was observed by a number of students.

54.    When walking between classes he was bumped and hit almost every day. In fact, many of these incidents were observed by a teacher named Mr. Burgess and he never reported it or had it investigated pursuant to Board policy.

55.    Mother reports that just prior to his death Jon began to take numerous showers and would stay there for a long time.  She thought this odd in light of the fact that previously he would avoid showering.

56.    On the day or so before Jon's death he was again placed into a trashcan but this time the acts of the bullies escalated; he was stripped nude and tied up and then placed in the trash can. He was called fag, queer, homo and douche.  This incident was observed by a number of students in the locker room.   This event was videotaped by J.R. and put on YouTube but was later taken down, upon the direction of some unknown staff member.  This staff member never appropriately addressed this incident, as required by Board policy.

57.    A picture and video taken from the school's security camera would show Jon walking to class with a wet shirt and wet head, which was never reported to administrative staff.

58.    In addition and just prior to his suicide Plaintiffs reasonably believe that Jon sent a text message to Mr. Terry Parham, stating (more or less) that "he couldn't take it anymore." As with the school counselor, Parham knew that Jon was a victim of bullying, knew he as suicidal and too failed to have these allegations of bullying investigated.  Nor did he refer Jon to a counselor, or let his parents know of Jon's text message.

59.    In addition and just prior to his suicide Plaintiffs understand that Jon had a phone call with Dayton Barone, telling him of his suicidal thoughts and feelings. As with the school counselor, Barone knew that Jon was a victim of bullying, knew he as suicidal and too failed

to have these allegations of bullying investigated.  Nor did he refer Jon to a counselor, or let his parents know of Jon's phone call.

60.     Mother remembers that when Jon came home from school that day he took two long showers and did the same on Saturday.

61.     Not all staff members were unconcerned about the bullying Jon received in athletics. Plaintiffs reasonably believe that at least one teacher[1] saw Jon being bullied and told Coach Strickland about their concerns.  Strickland told the teacher, in short, that "boys will be boys" and to leave it alone.  It is curious that the teacher is no longer with the district.

62.     The school district had a climate that was not only sensitive to bullying and harassment, but also was not sensitive to issues regarding depression and suicidality.  For instance, on the day of his suicide Jon spoke with A.S. and told her he was "going to do it."  She responded with, "I don't care, do whatever you want."

63.     Another female student (L.B.), who was grieving after Jon's death, went to Terry Parham, a few days after Jon's suicide and was told (more or less), "its been a week, get over it."

64.     In fact, another student reported that even after Jon's death, the bullying of some students continued.  Chris Montelongo and M.W. were heard that they would "dance on his grave."

65.     After it became known that Montelongo bullied Jon, he too became a victim of bullying. He went on national television noting that he too now was a victim of bullying and that the school was doing nothing about it the bullying against him.

66.     After Jon's decease, his school journal was read in class, where there were numerous and

---

[1].  Plaintiffs believe that it is either Shirley Gutkowski or Marguerite Wright.  Both are no longer with the district.

specific references to his suicidal ideation.  His teacher[2] was supposed to read his journal on a daily basis as part of his grade, but obviously did not, or if she did, she too failed respond appropriately.  This teacher never reported his suicidal thoughts or had it investigated pursuant to Board policy.[3]

67.     When Jon's family asked for the journal, the teacher told them she gave it to the school administrator.  When Jon's sister went to the school to ask for the journal she was told there was none.

68.     L.B. further reports that during the school year there were no school assemblies on bullying, no posters, class discussions, counseling for bullies or a confidential drop-box.

69.     Not one of the students who observed these incidents ever reported them to school officials. Of course, this failure of the young people should come as no surprise in light of the fact no adult, neither Jon's coaches, Jon's teachers nor his counselor, ever reported the bullying either.

## VI. STATE ACTION

70.     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

71.     The Defendant school district was at all times and in all matters acting under color of state law when they permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

---

[2].  We believe the teacher is Mrs. Hernandez.

[3].  When the Carmichael's asked for the Journal they were told there was none.

## VII. CLAIMS PURSUANT TO 42 U.S.C. §1983 AND THE 14th AMENDMENT TO THE U.S. CONSTITUTION

72.     Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

73.     The School District Defendant, acting under color of law and acting pursuant to customs and policies of the district, deprived Jon Thomas Carmichael of rights and privileges secured to him by the Fourteenth Amendment to the United States Constitution and by other laws of the United States.

74.     The acts and omissions of the School District Defendants deprived Jon of his rights to life, liberty and bodily integrity guaranteed under the United States Constitution, for which the School District Defendant is liable to Plaintiffs pursuant to 42 U.S.C. §1983 for compensatory monetary damages.

## VII.  UNCONSTITUTIONAL POLICIES, PROCEDURES , PRACTICES & CUSTOMS

75.     Plaintiffs incorporate by reference all the above related paragraphs above with the same force and effect as if herein set forth.

76.     Plaintiffs contend that these failures of the School District Defendant to have policies, procedures and practices to protect Jon from a known and inherent dangerous situation, bullying and harassment, violated the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

77.     Based upon the operative facts, such acts and omissions rise to the level of deliberate indifference and conscious indifference constituting a violation of the Fourteenth Amendment of the Constitution of the United States, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

## VIII.  CLAIMS FOR RELIEF PURSUANT TO TITLE IX

78.  Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

79.  Plaintiffs contend that these failures of the Defendant School District to have policies, procedures, practices and customs in place to assure Jon Thomas Carmichael was not a victim of harassment based upon gender, or based upon stereotypes based upon gender,, violated his rights Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.*, upon which he seeks recovery.

## IX.  VIOLATIONS OF THE TEXAS FAMILY CODE

80.  Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

81.  Chapter 261 of the Texas Family Code requires that a person who observes a child being abused or neglected, included assaulted, has a duty to report such acts or omissions to the appropriate legal authorities.

82.  When members of the Joshua ISD school community observed Jon being bullied by other students and failed to report such bullying, as required by the Texas Family Code, they violated that law thereby.

## X.  WRONGFUL DEATH CLAIMS

83.  Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

84.  This claim for damages resulting from the wrongful death of Jon is brought by his surviving parents, pursuant to Tex. Civ. Prac. & Rem. Code, 71.001 et. seq.  This claim is based upon the facts and legal theories more fully set out herein.

85.     At the time of death, the decedent was otherwise in reasonably good health with a normal life expectancy.

86.     The decedent was a loving and dutiful child and provided reasonable services to his parents and siblings.

87.     As a result of the wrongful death of Jon, his parents and siblings did suffer damages, including termination of the parent-child and familial relationship and severe mental anguish, and will, in reasonable probability, continue to suffer damages in the future as a direct result of the wrongful death of their son, in an amount within the jurisdictional limits of the court.

## XI.  SURVIVAL CLAIMS

88.     Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

89.     This claim for damages resulting from the death of Jon is brought by his surviving parents as personal representatives of his estate. This claim is based upon the facts and legal theories more fully set out herein.

90.     Any person required to be a named Plaintiff in this lawsuit to collect damages under Section 71.021., Tex. Civ. Prac. & Rem. Code, is a named Plaintiff, or will be added accordingly. Plaintiffs brings this survival action pursuant to Tex Civ. Prac. & Rem. Code, Section 71.021, because of personal injuries suffered by the decedent, which resulted in Jon's death, based upon the facts and legal theories more fully set out above.

91.     Plaintiffs seek damages for the conscious pain and suffering and mental anguish that the decedent suffered prior to death and for the reasonable and necessary medical, funeral and burial expenses which were reasonably incurred because of such wrongful death.  Plaintiffs seek damages within the jurisdictional limits of the court.

## XII.  COMMON LAW NEGLIGENCE

92.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

93.   Defendant Elizabeth Rosatelli, is School Counselor licensed by the State of Texas and is required to respond to a student who professes suicidal tendencies and to follow the standards of care for a reasonable professional in the community.  As she did not, she is individually liable to Plaintiffs for such failures.

## XIII.  RATIFICATION

94.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

95.   The School District Defendants ratified the acts, omissions and customs of school district personnel and staff.

96.   As a result the School District Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of Jon.

## XIII.  PROXIMATE CAUSE

97.   Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

98.   Each and every, all and singular of the foregoing acts and omissions, on the part of Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIV.  PUNITIVE DAMAGES

99.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

100.   The acts and omissions of the Defendant School District Defendants over the course of many years, and after receiving repeated notice of such acts and omissions not only shock the conscience, but satisfy criteria for punitive damages, as contemplated by Section 1983.

## XV.  THE DEFENDANT DESTROYED EVIDENCE

101.   The Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

102.   Representatives of the school district staff ordered at least one student to destroy evidence of the video which captured the assault of Jon.   In addition, staff also have hidden or destroyed Jon's personal journal.

## XVI.  ATTORNEY FEES

103.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein

104.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit.   Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to under 42 U.S.C. §1988(b), 42 U.S.C. §794a, pursuant to 42 U.S.C. § 2000d et seq.

## XVI.  DEMAND FOR JURY TRIAL

105.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

106.   **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against
Defendants, jointly and severally, in the manner and particulars noted above, and in an
amount sufficient to fully compensate them for the elements of damages enumerated above,
judgment for damages, recovery of attorney's fees and costs for the preparation and trial of
this cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1988; together with
pre- and post-judgment interest, and court costs expended herein, and for such other relief
as this Court in equity, deems just and proper and for such other relief as the Court may deem
just and proper in law or in equity.

Respectfully submitted,

Cirkiel & Associates, P.C.

 /s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
SBN 00783829

Mr. Michael Zimmerman, Esq.
The Zimmerman Law Firm
3501 W. Waco Drive
Waco, Texas  76710
(254) 752-9688 [Telephone]
(254) 752-9680 [Facsimile]
mzimmerman@thezimmermanlawfirm.com [Email]
SBN 222714007

**ATTORNEYS FOR PLAINTIFFS**

Original Complaint